**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

DENNIS DICKERSON                                    CIVIL ACTION

VERSUS                                                      NO. 15-6277

N. BURL CAIN                                          SECTION: "N"(3)

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Dennis Dickerson, is a state prisoner incarcerated at the David Wade Correctional Center in Homer, Louisiana. On February 1, 2011, he was convicted of second degree kidnapping under Louisiana law.[1] On June 20, 2011, he was found to be a habitual offender and was sentenced as such to a term of life imprisonment without benefit of probation, parole, or suspension of sentence.[2] On November 2, 2012, the Louisiana First Circuit Court of Appeal

---

[1] State Rec., Vol. 2 of 7, trial transcript, p. 386; State Rec., Vol. 1 of 7, minute entry dated February 1, 2011; State Rec., Vol. 1 of 7, jury verdict form.
[2] State Rec., Vol. 2 of 7, transcript of June 20, 2011; State Rec., Vol. 1 of 7, minute entry dated June 20, 2011.

affirmed his conviction and habitual offender adjudication, amended his habitual offender sentence to a term of life imprisonment with forty years to be served without benefit of parole, probation, or suspension of sentence, and affirmed that sentence as amended.[3] The Louisiana Supreme Court then denied his related writ application on May 3, 2013.[4]

On April 14, 2014, petitioner filed an application for post-conviction relief with the state district court.[5] That application was denied on May 22, 2014,[6] and his related writ applications were likewise denied by the Louisiana First Circuit Court of Appeal on September 8, 2014,[7] and by the Louisiana Supreme Court on September 18, 2015.[8]

In the interim, petitioner also filed a motion to correct sentence with the state district court.[9] That motion was denied as untimely on July 22, 2015.[10]

Petitioner thereafter filed the instant federal application seeking habeas corpus relief.[11] The state filed a response conceding that the application was timely.[12]

## **Standards of Review**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both. The amendments "modified a federal habeas court's role in

---

[3] State v. Dickerson, No. 2012 KA 0388, 2012 WL 5387365 (La. App. 1st Cir. Nov. 2, 2012); State Rec., Vol. 5 of 7.
[4] State v. Dickerson, 113 So.3d 209 (La. 2013); State Rec., Vol. 4 of 7.
[5] State Rec., Vol. 5 of 7.
[6] State Rec., Vol. 5 of 7, Reasons for Judgment and Judgment dated May 22, 2014.
[7] State v. Dickerson, No. 2014 KW 0922, 2014 WL 12569891 (La. App. 1st Cir. Sept. 8, 2014); State Rec., Vol. 5 of 7.
[8] State ex rel. Dickerson v. State, 178 So.3d 136 (La. 2015); State Rec., Vol. 5 of 7.
[9] State Rec., Vol. 5 of 7.
[10] State Rec., Vol. 5 of 7, Order dated July 22, 2015.
[11] Rec. Doc. 4.
[12] Rec. Doc. 12.

reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and

3

nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1706 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id. (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted). The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694. Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief. Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect

application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. White v. Woodall, 134 S. Ct. 1697, 1701 (2014).

## Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts of this case as follows:

The victim, Stephanie Lemme, met defendant while she was employed as a nurse between October 2007 and May 2008 at the St. Tammany Parish Jail. Defendant was incarcerated in the medical dormitory, and he and Lemme became close as they engaged in conversations unrelated to defendant's medical treatment. Eventually, defendant asked Lemme to call his mother on his behalf. Lemme complied. Near the beginning of June 2008, the topic of bonding defendant out of jail came up in conversations between Lemme and defendant. Lemme took cash out of her savings account and sold a Mercedes that she owned in order to give defendant money to pay his bonds in both Louisiana and Mississippi. When defendant was released from jail, he moved in with Lemme at her house in Covington on June 13. After a few weeks of living together harmoniously, defendant and Lemme began to argue. Lemme became upset about defendant's drinking habits and his use of her vehicle to go to destinations of which she was unaware.

On July 14, 2008, defendant picked up Lemme from Heritage Manor nursing home, her new place of employment, in her Ford Explorer. When Lemme went to put her purse in the back seat, she noticed beer cans and an ice chest, and she began a short argument with defendant about his drinking. While still in the vehicle, Lemme called her mother as defendant drove home. Once home, Lemme began to walk her dog as she informed her mother that defendant was drinking and that she was afraid. During this time, Lemme also received a call from her brother, and she expressed to him that she was afraid of defendant because he had been drinking and smoking. Lemme then told her brother that defendant was approaching her, and she disconnected the call.

As defendant approached Lemme, he told her to take him to his mother's house, which was located in Mississippi. Lemme did not want to drive defendant to Mississippi because of the price of gas, but she agreed to take him because she was afraid of him. As Lemme drove her vehicle near La. Hwy. 59, she and defendant continued to argue, and he began to hit her with his baseball cap and the back of his hand. When Lemme stopped at a gas station, she received a call from a police officer who had been dispatched to her home as a result of a call her brother had made after speaking with her. Lemme told the officer that she was all right. After she received another phone call, defendant took Lemme's phone and snapped it in half. At that time, defendant grabbed Lemme by the neck and told her just to go back to her home, but Lemme proceeded to drive toward Mississippi.

As Lemme drove on La. Hwy. 36, defendant hit her several more times. She pulled her vehicle over to the right shoulder, put it in park, and told defendant that she could not drive if he continued to hit her. Lemme attempted to exit the vehicle, but defendant grabbed her by her hair and her shoulders or arms, and he tried to pull her back to the vehicle. Lemme eventually succeeded in completely exiting the vehicle, and defendant followed after her. They began to struggle, and defendant hit Lemme several more times. Defendant ultimately persuaded Lemme to get back into the vehicle, except on the passenger's side, and he drove himself

and Lemme to his mother's house in Mississippi.  Lemme and defendant returned to her home the following day, after defendant's court appearance in Mississippi.

A couple of weeks following this incident, Lemme called defendant's bail bondsman, and he assisted her in getting defendant's bond revoked.  She also made a report about the incident to Detective John Morse, of the St. Tammany Parish Sheriff's Office.  Lemme provided Detective Morse with several photographs of her injuries that she indicated she had taken a few days following the incident.  These photographs showed bruising injuries to Lemme's left eye, her nose, her mouth, and her back right shoulder.  Based on this report, defendant was charged with second degree kidnapping.[13]

## Petitioner's Claims

## Sufficiency of the Evidence

Petitioner first claims that there was insufficient evidence to support his conviction.  On

direct appeal, the Louisiana First Circuit Court of Appeal denied that claim, holding:

In his first assignment of error, defendant argues that the evidence presented at trial was insufficient to support his conviction for second degree kidnapping.  Specifically, defendant argues that he had no intent to commit this offense, that he cannot be guilty of second degree kidnapping if he battered Lemme after their departure from her home, and that Lemme's actions were voluntary.

A conviction based on insufficient evidence cannot stand, as it violates due process.  See U.S. Const. amend. XIV; La. Const. art. I, § 2.  In reviewing claims challenging the sufficiency of the evidence, this court must consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).  See also La.C.Cr.P. art. 821(B); State v. Ordodi, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660; State v. Mussall, 523 So.2d 1305, 1308-09 (La. 1988).  The Jackson standard of review, incorporated in Article 821(B), is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt.  When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence.  State v. Patorno, 2001-2585 (La.App. 1st Cir. 6/21/02), 822 So.2d 141, 144.

Second degree kidnapping is defined, in pertinent part, as the forcible seizing and carrying of any person from one place to another, or the enticing or persuading of any person to go from one place to another, wherein the victim is

---

[13] State v. Dickerson, No. 2012 KA 0388, 2012 WL 5387365, at *1-2 (La. App. 1st Cir. Nov. 2, 2012); State Rec., Vol. 5 of 7.

physically injured.  La. R.S. 14:44.1(A)(3) & (B)(1)-(2).  Second degree kidnapping is a general intent crime, so proof of intent requires only a showing that the circumstances of the crime indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act.  See La. R.S. 14:10(2).

In the instant case, Lemme testified that she did not want to drive defendant to Mississippi, but that she acquiesced to defendant's demands out of fear.  As she initially drove defendant, he began to hit her.  When Lemme pulled over onto the shoulder of the road and attempted to flee her vehicle, defendant caught her and inflicted further physical abuse on her.  In doing so, defendant either forced Lemme back into the vehicle, or he persuaded her to reenter the vehicle.  Under either circumstance, defendant's actions were sufficient to demonstrate general criminal intent to commit second degree kidnapping.

Defendant argues that he could not be found guilty of second degree kidnapping where Lemme's physical injuries occurred after she and defendant left her home.  We disagree.  A simple reading of the pertinent second degree kidnapping provisions requires only that any forcible seizing and carrying, or enticing or persuading, occur "wherein" the victim is physically injured.  Lemme was clearly injured in this case after she was forced against her will to drive defendant to Mississippi.  If we were to read the second degree kidnapping statute as defendant argues, we would also have to read the statute to require that any sexual abuse that could occur during a second degree kidnapping happen during the seizing and carrying or enticing or persuading in order to satisfy the offense.  Such an interpretation is absurd.  Further, even if we were to read the statute as defendant argues, the jury still could have concluded that the second degree kidnapping occurred when Lemme attempted to flee her vehicle and defendant physically injured her before forcing or persuading her to reenter the vehicle.  Therefore, even under defendant's interpretation of the statute, this argument is not persuasive.

Finally, defendant argues that Lemme voluntarily went with him to Mississippi.  This hypothesis of innocence was supported at trial by defense counsel's argument that Lemme went to Mississippi voluntarily, but later lied to the police about the incident because she was upset with defendant for carrying on an affair with his ex-girlfriend.  At trial, Lemme clearly communicated to the jury that she went with defendant initially due to her fear and that she was then forced to continue traveling with defendant as a result of his physical violence towards her.  Lemme further testified that she did not falsely report defendant's actions out of any jealousy.  Therefore, Lemme's testimony directly contradicts defendant's contention of voluntariness.

The only testimony given at trial that might support defendant's argument that Lemme voluntarily traveled with him to Mississippi came from his mother, who stated that nothing alarmed her on July 14, 2008, when defendant and Lemme stayed with her.  The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness.  Moreover, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the

credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Richardson, 459 So.2d 31, 38 (La.App. 1st Cir. 1984). The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a fact finder's determination of guilt. State v. Taylor, 97-2261 (La.App. 1st Cir. 9/25/98), 721 So.2d 929, 932. Further, a reviewing court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the fact finder. See State v. Calloway, 2007-2306 (La.1/21/09), 1 So.3d 417, 418 (per curiam). Clearly, in this case, the jury chose to believe Lemme's testimony that she did not voluntarily travel with defendant and that she did not overtly seek help on the day of the incident because she was afraid. On the record before us, we cannot say that this conclusion is unreasonable.

Viewed in the light most favorable to the prosecution, the evidence was sufficient to support a finding that defendant was guilty of the second degree kidnapping of Lemme. Lemme testified that she left with defendant because she was afraid of him and that defendant physically injured her while she drove him to his mother's house. When Lemme tried to flee her vehicle to avoid further abuse, defendant used violence to force or entice her to reenter it, and he began driving.

This assignment of error is without merit.[14]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[15]

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000). He has not done so.

As the Louisiana First Circuit Court of Appeal correctly noted, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307

---

[14] State v. Dickerson, No. 2012 KA 0388, 2012 WL 5387365, at *2-4 (La. App. 1st Cir. Nov. 2, 2012); State Rec., Vol. 5 of 7.
[15] State v. Dickerson, 113 So.3d 209 (La. 2013); State Rec., Vol. 4 of 7.

(1979). In Jackson, the United States Supreme Court held that, in assessing such a claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'" Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added); see also Cavazos v. Smith, 561 U.S. 1, 2 (2011) ("[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. ... Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold."). Moreover, because the state court's decision applying the already deferential Jackson standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential." Parker v. Matthews, 132 S. Ct. 2148, 2152 (2012); see also Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012).

Further, it must be remembered that Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does *not* apply in federal habeas corpus proceedings; in these proceedings, *only* the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof. Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), aff'd, 434 Fed. App'x 405 (5th Cir. 2011); Williams v. Cain, No. 07-4148, 2009

WL 224695, at *4 (E.D. La. Jan. 29, 2009), aff'd, 408 Fed. App'x 817 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), aff'd, 372 Fed. App'x 549 (5th Cir. Apr. 9, 2010); see also Coleman, 132 S. Ct. at 2064 ("Under Jackson, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

In the instant case, the elements of the crime and petitioner's guilt was established through the victim's testimony, and it is clear that *a victim's testimony alone is generally sufficient evidence to support a conviction.* Peters v. Whitley, 942 F.2d 937, 941-42 (5th Cir. 1991); see also Fetterley v. Whitley, No. 9430310, 1994 WL 708655, at *1 n.6 (5th Cir. Dec. 6, 1994); Holderfield v. Jones, 903 F. Supp. 1011, 1017 (E.D. La. 1995). Although petitioner claims that the victim lied, the jury obviously found her testimony credible. Where, as here, a petitioner's insufficient evidence claim is based on arguments concerning witness credibility, a federal habeas court generally will not grant relief. See Schlup v. Delo, 513 U.S. 298, 330 (1995) ("[U]nder Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review."); Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); McCowin v. Scott, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994); Phillips v. Cain, Civ. Action No. 11-2725, 2012 WL 2564926, at *14 (E.D. La. Apr. 11, 2012), adopted, 2012 WL 2565025 (E.D. La. July 2, 2012); Picou v. Cain, Civ. Action No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

In summary, when the evidence in this case is viewed in the light most favorable to the prosecution, it simply cannot be said that the guilty verdict was *irrational*. Therefore, petitioner cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, under the doubly-deferential standards of review which must be applied by this federal habeas court, relief is not warranted.

## Improper Admission of "Other Crimes" Evidence and Expert Testimony

Petitioner also presents two claims that his rights were violated when the trial court allowed improper evidence to be introduced at trial. Specifically, he argues that the prosecution should not have been allowed to introduce (1) evidence concerning his prior similar crimes and (2) expert testimony by Detective Morse on the subject of "escalation" in the domestic violence context. Those claims, which were listed as claims two and four in his federal application, are discussed together herein since they both concern evidentiary rulings by the trial court and, therefore, must be considered using the same analysis.

On direct appeal, the Louisiana First Circuit Court of Appeal denied both claims. With respect to the claim challenging the introduction of the "other crimes" evidence, the Court of Appeal held:

> In his second assignment of error, defendant argues that the trial court erred in allowing the State to introduce evidence of other abusive acts committed against two other women prior to the incident at issue in the instant case thereby entitling him to a new trial.
> At trial, the jury heard testimony from April Ryback and Tanya Comeaux, two women who had previously experienced physical abuse from defendant while they were in relationships with him. Ryback testified that she dated defendant briefly in 1999, and that on February 23, 1999, he appeared at her house while she was cooking. She stated that defendant knocked on her door and told her that he wanted her to bring him somewhere. Ryback told defendant that she would not

bring him anywhere, and she did not let him in her house. Shortly thereafter, defendant broke into her bedroom window. As Ryback tried to grab her daughter and flee, defendant grabbed her and dragged her back to her bedroom. He threw her down in the closet and began to choke her. Ryback finally agreed to take defendant wherever he wanted to go, but when she made it outside with her daughter and defendant, she began to scream. Defendant threw her on the ground, grabbed her keys, and took her car. As a result of the incident, Ryback suffered injuries to her face and neck. Defendant later pled guilty to theft and unauthorized entry of an inhabited dwelling as a result of this incident.

Tanya Comeaux testified that she knew defendant when he was going by the name Dennis Smith. On November 2, 2007, she and defendant's father were in a truck. Defendant and his father got into an argument, and defendant's father exited the truck. When Comeaux attempted to exit the truck as well, defendant punched her in the mouth and put her in the back of the truck. Defendant drove her to a friend's house. Shortly thereafter, defendant and another friend forced Comeaux into the back of the truck again, and defendant drove her to the Bogue Chitto River. At the river, he struck her in the face and on her back with a belt, his fists, and his feet. Defendant again forced Comeaux back into his truck, and he began driving at a high rate of speed. He then opened the door and pushed her out. Comeaux attempted to hold on to the door, but defendant accelerated as he dragged her, and she eventually fell completely out of the vehicle. When Comeaux regained consciousness, she flagged down a passing motorist, who brought her to a hospital, where she was treated for extensive injuries to her face, back, legs, and feet.

Prior to trial, the court held a Prieur[FN 1] hearing to determine the admissibility at trial of these other bad acts pursuant to La. C.E. art. 404(B)(1). Having heard testimony from investigators familiar with those incidents, the trial court noted "several very distinctive features" between the incidents involving Ryback and Comeaux and with the facts of this case. With respect to Ryback, the trial court pointed out that "[t]he facts relative to wishing to receive transportation and physical coercion being utilized thereafter" bore a "marked resemblance to some of the allegations in this case." The trial court also noted similarities in the entire incident involving Comeaux and the injuries sustained by the victim during that incident. Overall, the trial court found that "there has been clear and convincing evidence presented ... on these two [prior acts]."

[FN 1]  State v. Prieur, 277 So.2d 126 (La. 1973).

Generally, evidence of other crimes committed by the defendant is inadmissible due to the "substantial risk of grave prejudice to the defendant." To admit "other crimes" evidence, the State must establish that there is an independent and relevant reason for doing so, i.e., to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act. The Louisiana Supreme Court has also held other crimes evidence admissible as proof of other

crimes exhibiting almost identical modus operandi or system, committed in close proximity in time and place. Evidence of other crimes, however, is not admissible simply to prove the bad character of the accused. Furthermore, the other crimes evidence must tend to prove a material fact genuinely at issue and the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. State v. Tilley, 99-0569 (La. 7/6/00), 767 So.2d 6, 22, cert. denied, 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d 375 (2001).

The procedure to be used when the State intends to offer evidence of other criminal offenses was formerly controlled by Prieur. Prior to its repeal by 1995 La. Acts No. 1300, § 2, La. C.E. art. 1103 provided that the notice requirements and clear and convincing evidence standard of Prieur and its progeny were not overruled by the Code of Evidence. Prieur dealt with La. R.S. 15:445 and La. R.S. 15:446, now-repealed statutes, which addressed the admissibility of other crimes evidence. Under Prieur, the State was required to give a defendant notice, both that evidence of other crimes would be offered against him, and of which exception to the general exclusionary rule the State intended to rely upon. Prieur, 277 So.2d at 130. Additionally, the State had to prove by clear and convincing evidence that the defendant committed the other crimes. Prieur, 277 So.2d at 129; see also State v. Code, 627 So.2d 1373, 1381 (La. 1993), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994).

However, 1994 La. Acts 3d Ex.Sess., No. 51, §§ 1 & 2 amended La. C.E. art. 404(B) and added La. C.E. art. 1104, respectively. The amendment to Article 404(B) inserted into the article the language "provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes."

Article 1104 of the Code of Evidence provides that the burden of proof in pretrial Prieur hearings, "shall be identical to the burden of proof required by Federal Rules of Evidence Article IV, Rule 404." The burden of proof required by Federal Rules of Evidence Article IV, Rule 404, is satisfied upon a showing of sufficient evidence to support a finding by the jury that the defendant committed the other crime, wrong, or act. See Huddleston v. U.S., 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988). The Louisiana Supreme Court has yet to address the issue of the burden of proof required for the admission of other crimes evidence in light of the repeal of Article 1103 and the addition of Article 1104. However, numerous Louisiana appellate courts, including this court, have held that burden of proof to now be less than "clear and convincing." See State v. Williams, 99-2576 (La.App. 1st Cir. 9/22/00), 769 So.2d 730, 735 n. 4.

We find that the trial court did not err or abuse its discretion in allowing the introduction of the other crimes evidence presented by the State. In this case, the testimony of the investigators at the Prieur hearing and of Ryback and Comeaux at trial clearly identified defendant as the perpetrator of the other offenses. Further, the evidence of the other incidents highlighted defendant's intent, plan, or absence of mistake in committing the instant offense because the methods of commission

of the instant offense and the other crimes involved similar behavior and similar inflicted injuries. Finally, while the introduction of this other crimes evidence was certainly prejudicial on some level, the probative value of this evidence – to show that defendant had engaged in similar patterns of behavior in the past, thereby bolstering the victim's credibility – outweighed any prejudice.

Further, we find that even if the trial court did err or abuse its discretion in allowing the introduction of defendant's other crimes evidence, any such error is harmless beyond a reasonable doubt. Article 921 of the Code of Criminal Procedure states that "[a] judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused." The test for determining whether an error is harmless is whether the verdict actually rendered in the case "was surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). In the instant case, the evidence of defendant's guilt presented through the testimony of the victim herself was substantial and greatly detailed. In contrast, the evidence of defendant's other crimes was presented relatively quickly and occupied only a minimal portion of the overall trial. In light of the substantial amount of direct evidence presented at trial describing defendant's instant offense, we find that even if the trial court erred in admitting evidence of defendant's other crimes, defendant's guilty verdict was surely unattributable to any potential error. As such, defendant is not entitled to a new trial on this basis.

This assignment of error lacks merit.[16]

With respect to the claim challenging the expert testimony by Detective Morse, the Court of Appeal held:

In his fourth assignment of error, defendant argues that the trial court erred when it allowed Detective Morse to "give an expert opinion on domestic violence escalation."

At trial, Detective Morse testified on direct examination about the concept of escalation. Detective Morse stated that in a domestic violence context, escalation occurs when abuses start out small and then evolve into more serious acts of violence. He testified that it is typical in such a context to see an evolution from verbal and mental abuse, to isolation of assets (such as vehicles or access to bank accounts), to physical violence, then to strangulation, and then to homicide. The State elicited this testimony from Detective Morse in order to demonstrate the legitimacy of the fear that Lemme felt towards defendant. Lemme later testified at trial that defendant verbally abused her, used her car without permission, and occasionally hit her.

---

[16] State v. Dickerson, No. 2012 KA 0388, 2012 WL 5387365, at *4-7 (La. App. 1st Cir. Nov. 2, 2012); State Rec., Vol. 5 of 7.

Prior to Detective Morse's testimony on the concept of escalation, defense counsel objected to that line of questioning as requiring an expert opinion. The trial court initially sustained the objection, but it allowed the State to present evidence of Detective Morse's qualifications if it wanted to pursue questioning on this topic. Detective Morse testified that in ten years as a detective, he had handled many cases involving domestic violence, including cases that resulted in homicide or near homicide from domestic violence. Detective Morse stated that he had studied the concept of escalation as a result of his employment and that he had advised other members of his department on this specific concept but not as an expert witness. He also stated that he had previously testified in court regarding the same concept. Detective Morse stated that his studies of the issue of escalation had come from his "[o]bservations, experience, [and] working context dealing with professionals" from domestic violence assistance organizations. He also indicated that he had read numerous articles, books, and brochures on the subject and domestic violence in general. After hearing these qualifications, the trial court then overruled defense counsel's objection and allowed Detective Morse to testify pursuant to La. C.E. art. 701.

A law enforcement officer is permitted to express an opinion regarding matters of personal knowledge gained through experience, even if the witness is not first qualified as an expert. See La. C.E. art. 701; State v. Friday, 2010-2309 (La.App. 1st Cir. 6/17/11), 73 So.3d 913, 922, writ denied, 2011-1456 (La. 4/20/12), 85 So.3d 1258. The trial court is vested with much discretion in determining which opinion testimony shall be received into evidence as lay or expert testimony. Friday, 73 So.3d at 922.

Detective Morse was not tendered as an expert under La. C.E. art 702. We disagree with defendant's contention that expert testimony was required to explain to the jury the concept of domestic violence escalation. Detective Morse readily encountered this concept in his daily experiences as an investigator, and that experience was sufficient to allow him to explain this concept to the jury at trial. The trial court did not err or abuse its discretion in finding that Detective Morse's personal knowledge, training, and experience in the field enabled him to give an opinion about what is typical behavior in a domestic violence setting.

This assignment of error is without merit.[17]

The Louisiana Supreme Court then likewise denied relief on both claims without assigning additional reasons.[18]

---

[17] State v. Dickerson, No. 2012 KA 0388, 2012 WL 5387365, at *8-9 (La. App. 1st Cir. Nov. 2, 2012); State Rec., Vol. 5 of 7.
[18] State v. Dickerson, 113 So.3d 209 (La. 2013); State Rec., Vol. 4 of 7.

Both of these claims challenge the trial court's evidentiary rulings. However, as the United States Fifth Circuit Court of Appeals has held: "In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law." Little v. Johnson, 162 F.3d 855, 862 (5th Cir. 1998). Therefore, to the extent that petitioner is arguing that the state courts misapplied state evidence law in these instances, his claims simply are not reviewable in this federal proceeding.

To the extent that petitioner is asserting federal claims, he fares no better.[19] Even if petitioner could show that the evidence in question was in fact improperly admitted, federal habeas relief still would not be warranted. The United States Fifth Circuit Court of Appeals has explained:

> We will not grant habeas relief for errors in a trial court's evidentiary rulings unless those errors result in a "denial of fundamental fairness" under the Due Process Clause. The erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's conviction.

Neal v. Cain, 141 F.3d 207, 214 (5th Cir. 1998) (citations omitted); see also Little, 162 F.3d at 862 ("[O]nly when the wrongfully admitted evidence has played a crucial, critical, and highly significant role in the trial will habeas relief be warranted.").

Even aside from the challenged evidence, there was other compelling evidence of petitioner's guilt of the instant offense, i.e. the testimony of the victim, Stephanie Lemme. In light

---

[19] In its response, the state argues that petitioner pursued these two claims in the state court based solely on purported state-law violations, and, therefore, any federal claims would be unexhausted. Rec. Doc. 12, pp. 8-9. However, it is clear that a federal court has the authority to deny a habeas claim on the merits regardless of whether the petitioner exhausted his state court remedies and whether exhaustion is waived by the state. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); Jones v. Jones, 163 F.3d 285, 299 (5th Cir. 1998); Woods v. Cain, Civ. Action No. 06-2032, 2008 WL 2067002, at *8 n. 8 (E.D. La. May 13, 2008). If petitioner's claims are construed as being based in federal law either in whole or part, it is recommended that they simply be dismissed with prejudice on that basis in the interest of judicial economy.

of that testimony, which the jury obviously found credible, it is simply cannot be said that the evidence now challenged by petitioner played a "crucial, highly significant factor" in his conviction. See, e.g., Colbert v. Cain, Civ. Action No. 14-2472, 2016 WL 4186551, at *18 (E.D. La. Apr. 12, 2016), adopted, 2016 WL 4161257 (E.D. La. Aug. 5, 2016). Therefore, the admission of the evidence did not result in a denial of fundamental fairness.

In summary, petitioner has failed to demonstrate that the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, applying the AEDPA's deferential standard, this Court should likewise reject his evidentiary claims.

### Denial of Motion to Suppress Statement

Petitioner next claims that the trial court erred in denying the defense motion to suppress his statement. On direct appeal, the Louisiana First Circuit Court of Appeal denied that claim, holding:

> In his third assignment of error, defendant argues that the trial court erred in denying a motion to suppress a statement that he made to Detective Morse. Specifically, defendant alleges that the State failed to prove beyond a reasonable doubt that he voluntarily and intelligently waived his Miranda[FN 2] rights and that his statement was made freely and voluntarily, and not under the influence of fear, intimidation, menaces, threats, inducements, or promises.

> [FN 2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

> During a pretrial hearing and at trial,[FN 3] Detective Morse testified that he went to the parish jail to interview defendant after the victim had made her report about the incident. When Detective Morse initially approached defendant, he began to briefly inform defendant about the allegations that Lemme made against him. As Detective Morse was in the middle of informing defendant of these allegations, defendant interrupted him and stated that Lemme had been involved in a fight with a female cousin of his at a party, which was the source of the injuries Lemme documented in her photographs. Once defendant made that statement, Detective

18

Morse immediately asked defendant whether he would be willing to speak about the incident. Defendant replied that he would but that he was not going to sign the <u>Miranda</u> form provided by Detective Morse. Corporal Lance Toups, assisting Detective Morse, advised defendant of his rights, and defendant indicated that he understood them, but he reiterated that he would not sign any form. Corporal Toups indicated on the <u>Miranda</u> form that defendant refused to sign it. In the subsequent conversation between defendant and Detective Morse, defendant gave only a first name for his cousin, and he indicated that it would be difficult to find her. No other statement from defendant was introduced at trial.

> [FN 3] In determining whether the ruling on the motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. We may also consider all pertinent evidence given at the trial of the case. <u>State v. Chopin</u>, 372 So.2d 1222, 1223 n. 2 (La. 1979).

Before a confession can be introduced in evidence, the State has the burden of affirmatively proving that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La. R.S. 15:451. It must also be established that an accused who makes a confession during custodial interrogation was first advised of his <u>Miranda</u> rights. Spontaneous and voluntary statements, not given as a result of police interrogation or compelling influence, are admissible in evidence without <u>Miranda</u> warnings even where a defendant is in custody. <u>State v. Jones</u>, 386 So.2d 1363, 1365-66 (La. 1980); <u>State v. Guidry</u>, 496 So.2d 650, 653 (La.App. 1st Cir. 1986), <u>writ denied</u>, 500 So.2d 420 (La. 1987).

In this case, it is clear that defendant's initial statement to Detective Morse, referencing a fight between Lemme and a cousin of defendant's, was the result of a spontaneous utterance. Having come to interview a witness with a rights form, Detective Morse obviously intended to advise defendant of his rights after he detailed to defendant the allegations against him. However, before Detective Morse could complete his recitation of the allegations, defendant interrupted him and provided an exculpatory statement of his own. Under these circumstances, the statement was completely unsolicited and voluntary. Therefore, the trial court correctly ruled it admissible.

The only other statement of defendant's introduced at trial further elaborated upon the statement he initially made, and it purported to name his cousin and to declare her difficult to find. Detective Morse's testimony indicates that defendant made this statement after being fully advised of his <u>Miranda</u> rights and refusing to sign the <u>Miranda</u> form. Detective Morse's testimony was the sole proof, one way or another, of the voluntariness of defendant's statement. On the record before us, we cannot conclude that the trial court erred or abused its discretion in concluding that the State carried its burden of proving the voluntariness of defendant's statement. Moreover, even if we were to find that the trial court erred

in admitting the statements defendant made to Detective Morse, any such error would be harmless beyond a reasonable doubt. The admitted statements were purely exculpatory in nature, and defendant has not argued, either in the trial court or on appeal, that the effect of these statements at trial had any prejudicial effect, such as to malign his credibility.

This assignment of error is without merit.[20]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[21]

This Court need not definitively determine whether petitioner's first statement was admissible as a "spontaneous utterance" prior to the completion of the advisement of the Miranda warnings or whether the Miranda warnings were in fact administered so as to make the second statement admissible. Even if one or both of the statements ran afoul of Miranda, it is clear that Miranda violations are subject to a harmless error analysis. Hopkins v. Cockrell, 325 F.3d 579, 583 (5th Cir. 2003). Therefore, even if the state court erred, federal habeas corpus relief would not be warranted unless that error had a substantial and injurious effect or influence in determining the jury's verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

As the state court noted, the statements at issue here were not inculpatory; on the contrary, petitioner made the statements in an attempt to exculpate himself. It simply cannot be said that the statements affected or influenced the jury's guilty verdict – that verdict obviously resulted from the victim's compelling testimony, not these innocuous statements. Accordingly, this claim should be denied.

---

[20] State v. Dickerson, No. 2012 KA 0388, 2012 WL 5387365, at *7-8 (La. App. 1st Cir. Nov. 2, 2012); State Rec., Vol. 5 of 7.
[21] State v. Dickerson, 113 So.3d 209 (La. 2013); State Rec., Vol. 4 of 7.

## Excessive Sentence

Petitioner next claims that his sentence is excessive.  On direct appeal, the Louisiana First

Circuit Court of Appeal denied that claim, holding:

> [D]efendant asserts that the trial court erred in imposing a constitutionally excessive sentence.  Specifically, defendant contends that his habitual offender sentence of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence, is grossly disproportionate and shocks the sense of justice.
>
> Before we address whether defendant's sentence is excessive, we note a sentencing error that renders defendant's habitual offender sentence illegal.  An illegal sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review.  La.C.Cr.P. art. 882(A).
>
> After defendant's conviction, the State filed a habitual offender bill of information alleging that defendant had eight prior felony convictions.  At defendant's habitual offender hearing, the State presented evidence that defendant had the following predicate convictions:  (1) a May 3, 1999 conviction for simple escape under docket number 300785 in St. Tammany Parish; (2) a May 5, 2000 conviction for theft of goods over $500.00 under docket number 302263 in St. Tammany Parish; (3) a May 5, 2000 conviction for unauthorized entry of an inhabited dwelling under docket number 302264 in St. Tammany Parish; (4) a May 5, 2000 conviction for attempted possession of a Schedule II controlled dangerous substance (cocaine) under docket number 318243 in St. Tammany Parish; (5) a July 13, 2001 conviction for assault on a public servant under docket number CR-1742-01-D in Hidalgo County, Texas; (6) a September 15, 2008 conviction for theft of goods valued between $100.00 and $500.00 under docket number 384536 in St. Tammany Parish; (7) a May 22, 2009 conviction for accessory after the fact to first degree robbery under docket number 07-CR1-97139 in Washington Parish; and (8) a July 20, 2009 conviction for simple escape under docket number 439888 in St. Tammany Parish.  (Habitual offender exhibits 4-13).
>
> After reviewing the evidence presented in relation to defendant's alleged predicate convictions, the trial court found that the State had carried its burden of proving that defendant had six predicate felony convictions in the above cases from St. Tammany Parish.  The court found that defendant's alleged predicate conviction from Hidalgo County, Texas was not satisfactorily linked.  The trial court further found that defendant's Washington Parish conviction for accessory after the fact to first degree robbery was inadequately linked because it did not include his fingerprints.  On this basis, the trial court noted that defendant had at least six prior felony convictions that would classify him as a fourth-felony habitual offender and qualify him for a term of imprisonment of not less than the longest prescribed for a first conviction but in no event less than twenty years and no more than natural life.[FN 4]  See La. R.S. 15:529.1(A)(1)(c)(i) (prior to 2010 amendments).

[FN 4]  We note that the trial court may have failed to recognize that under La. R.S. 15:529.1(B), multiple convictions obtained on the same day prior to October 19, 2004, shall be counted as one conviction for purposes of the Habitual Offender Law.  Because the trial judge accepted all of defendant's predicate convictions out of St. Tammany Parish and remarked that defendant had "at least six prior felony convictions," he appears to have separately counted defendant's three convictions from May 5, 2000.  However, this error needs no correction because even with those three convictions counted as one under the Habitual Offender Law, defendant still qualifies as a fourth-or-subsequent-felony habitual offender under La. R.S. 15:529.1(A)(1)(c)(i).

Even though the trial court recognized that defendant should have been sentenced under La. R.S. 15:529.1(A)(1)(c)(i) (prior to 2010 amendments), he then sentenced defendant to a term of life imprisonment, without benefit of parole, probation, or suspension of sentence.  Under the Habitual Offender Law, a term of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence, is authorized only when a defendant's predicate convictions and his instant conviction fall within special categories.  If a defendant's third or fourth felonies and two of his prior felonies are crimes of violence, sex offenses with a victim under the age of eighteen, drug offenses punishable by imprisonment for ten years or more, or any other crime punishable by imprisonment for twelve years or more, or any combination of such crimes, he is subject to a mandatory sentence of life imprisonment, without benefit of parole, probation, or suspension of sentence.  See La. R.S. 15:529.1(A)(1)(b)(ii) & (c)(ii) (prior to 2010 amendments).

In the instant case, only defendant's instant conviction for second degree kidnapping qualifies under one of the categories enumerated in La. R.S. 15:529.1(A)(1)(c)(ii) (prior to 2010 amendments).  None of the predicate convictions found by the trial court to apply in defendant's case are crimes of violence, sex offenses with minor victims, drug offenses punishable by imprisonment for ten years or more, or other offenses punishable by imprisonment for twelve years or more.  Accordingly, the trial court's imposition of defendant's entire life sentence without parole was illegal.

When the correction of an illegal sentence involves sentencing discretion, an appellate court ordinarily should remand the case to the trial court for resentencing.  However, in the instant case, we may correct defendant's illegal sentence on appeal rather than by remand for resentencing, because the trial court attempted to impose the maximum legal sentence in this matter, and thus, no exercise of sentencing discretion is involved.  See La.C.Cr.P. art. 882(A); State v. Miller, 96-2040 (La.App. 1st Cir. 11/7/97), 703 So.2d 698, 701, writ denied, 98-0039 (La. 5/15/98), 719 So.2d 459.  Here, under La. R.S. 15:529.1(A)(1)(c)(i) (prior to 2010 amendments), the range for defendant's habitual offender sentence was not less than the longest sentence prescribed for a first conviction but in no event less

than twenty years and not more than his natural life. Under La. R.S. 14:44.1(C), defendant was subject to a maximum sentence of forty years at hard labor, at least two of which shall be imposed without benefit of parole, probation, or suspension of sentence. Therefore, defendant's sentencing range under the applicable habitual offender provision is not less than forty years or more than his natural life.

Because the trial court attempted to sentence defendant to the maximum legal sentence, we affirm the trial court's sentencing of defendant to life imprisonment under La. R.S. 15:529.1(A)(1)(c)(i) (prior to 2010 amendments). Under State v. Bruins, 407 So.2d 685, 687 (La. 1981), the conditions imposed on this sentence are those called for in the reference statute. Had defendant been sentenced under the second degree kidnapping statute alone, the trial court could have restricted defendant's parole eligibility on a maximum sentence of forty years for the entirety of that term. See La. R.S. 14:44.1(C). Because the trial court in this case attempted to restrict defendant's parole eligibility for the maximum term, we do the same in defendant's amended sentence. Therefore, we amend defendant's habitual offender sentence to life imprisonment, with forty years of said sentence to be served without benefit of parole, probation, or suspension of sentence. Based on defendant's fifth assignment of error, we now must address whether defendant's amended sentence is constitutionally excessive.

Article I, Section 20 of the Louisiana Constitution prohibits the imposition of excessive punishment. Although a sentence may fall within statutory limits, it may nevertheless violate a defendant's constitutional right against excessive punishment and is subject to appellate review. State v. Sepulvado, 367 So.2d 762, 767 (La. 1979). Generally, a sentence is considered constitutionally excessive if it is grossly disproportionate to the severity of the crime or is nothing more than the needless imposition of pain and suffering. State v. Dorthey, 623 So.2d 1276, 1280 (La. 1993). A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm to society, it is so disproportionate as to shock one's sense of justice. State v. Reed, 409 So.2d 266, 267 (La. 1982). A trial court is given wide discretion in the imposition of sentences within statutory limits, and the sentence imposed should not be set aside as excessive in the absence of manifest abuse of discretion. State v. Lanclos, 419 So.2d 475, 478 (La. 1982). See also State v. Savario, 97-2614 (La.App. 1st Cir. 11/6/98), 721 So.2d 1084, 1089, writ denied, 98-3032 (La. 4/1/99), 741 So.2d 1280.

Maximum sentences may only be imposed for the most serious offenses and the worst offenders, or when the offender poses an unusual risk to the public safety due to his past conduct of repeated criminality. Miller, 703 So.2d at 701. A trial court is entitled to consider the defendant's entire criminal history in determining the appropriate sentence to be imposed. State v. Ballett, 98-2568 (La.App. 4th Cir. 3/15/00), 756 So.2d 587, 602, writ denied, 2000-1490 (La. 2/9/01), 785 So.2d 31.

Article 894.1 of the Louisiana Code of Criminal Procedure sets forth items that must be considered by the trial court before imposing sentence. The trial court need not recite the entire checklist of Article 894.1, but the record must reflect that it adequately considered the guidelines. State v. Herrin, 562 So.2d 1, 11 (La.App.

1st Cir.), writ denied, 565 So.2d 942 (La. 1990). In light of the criteria expressed by Article 894.1, a review for individual excessiveness should consider the circumstances of the crime and the trial court's stated reasons and factual basis for its sentencing decision. State v. Watkins, 532 So.2d 1182, 1186 (La.App. 1st Cir. 1988). Remand for full compliance with Article 894.1 is unnecessary when a sufficient factual basis for the sentence is shown. Lanclos, 419 So.2d at 478.

In sentencing defendant as a habitual offender, the trial judge stated that he considered the sentencing mandates of La.C.Cr.P. art. 894.1 and that he was convinced defendant had an extensive criminal history. He noted that even though he found defendant's Hidalgo County and Washington Parish convictions insufficient for habitual offender adjudication purposes, he found these convictions significant enough to consider in actually sentencing defendant. The trial judge also noted that defendant had committed all of his offenses by the approximate age of thirty. He further found that any sentence less than the maximum would deprecate the seriousness of the instant offense and would deprecate the seriousness of defendant's lengthy criminal history. The trial judge stated that defendant exhibited violent tendencies through his actions in the instant case and that his release could endanger the victim or others. Finally, he noted that defendant had shown no remorse. In light of all of these considerations, the trial judge attempted to impose the maximum possible habitual offender sentence upon defendant.

Considering the trial court's stated reasons and defendant's past conduct of repeated criminality, we find that no abuse of the trial court's sentencing discretion occurred where the trial court attempted to impose the maximum legal sentence in this case. As a result, we find that defendant's amended sentence of life imprisonment, with forty years to be served without benefit of parole, probation, or suspension of sentence, is not excessive.

As to defendant's amended sentence, this assignment of error is without merit.[22]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[23]

To the extent that petitioner is claiming that his sentence is excessive or otherwise inappropriate under Louisiana law, that claim is not cognizable in this federal proceeding. Again, federal habeas corpus relief is available only to correct violations of federal constitutional law and, therefore, this Court does not sit to review alleged errors of state law. Narvaiz v. Johnson, 134

---

[22] State v. Dickerson, No. 2012 KA 0388, 2012 WL 5387365, at *9-12 (La. App. 1st Cir. Nov. 2, 2012); State Rec., Vol. 5 of 7.
[23] State v. Dickerson, 113 So.3d 209 (La. 2013); State Rec., Vol. 4 of 7.

F.3d 688, 695 (5th Cir. 1998). Accordingly, a federal habeas court will not review the legality of a petitioner's sentence under state law. See, e.g., Nyberg v. Cain, Civ. Action No. 15-98, 2015 WL 1540423, at *12 (E.D. La. Apr. 7, 2015); Phillips v. Cain, Civ. Action No. 13-5868, 2014 WL 4425751, at *10 (E.D. La. Sept. 8, 2014), adopted, 2014 WL 5080246 (E.D. La. Sept. 26, 2014); Brunet v. Goodwin, Civ. Action No. 12-1974, 2013 WL 623505, at *12 (E.D. La. Jan. 22, 2013), adopted, 2013 WL 619278 (E.D. La. Feb. 19, 2013).

On the other hand, to the extent that petitioner is claiming that his sentence is excessive under *federal* law, that claim obviously is cognizable; however, it is also meritless.[24] Even considering petitioner's argument that his sentence is harsh, the mere fact that a sentence is harsh does not mean that it is unconstitutionally excessive. For the following reasons, petitioner's sentence does not cross that impermissible line.

In Solem v. Helm, 463 U.S. 277, 284 (1983), the Supreme Court held that the Eighth Amendment "prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed." "This constitutional principle is tempered, however, by the corollary proposition that the determination of prison sentences is a legislative prerogative that is primarily within the province of legislatures, not courts." United States v. Gonzales, 121 F.3d 928, 942 (5th Cir. 1997) (citing Rummel v. Estelle, 445 U.S. 263, 274-76 (1980)). "[C]ourts must grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." Gonzales, 121 F.3d at 942 (quotation marks omitted).

_____

[24] In its response, the state argues that petitioner pursued this claim in the state court based solely on a purported state-law violation, and, therefore, any federal claim would be unexhausted. Rec. Doc. 12, p. 9. However, if petitioner's claim is construed as being based on federal law either in whole or part, it is again recommended that it simply be dismissed with prejudice on that basis in the interest of judicial economy. See *supra* note 19.

"[T]herefore, it is firmly established that successful challenges to the proportionality of punishments should be exceedingly rare." Id. (quotation marks omitted).

Interpreting Solem in light of intervening precedent, the United States Fifth Circuit Court of Appeals has set forth the framework to be used when analyzing a claim that a sentence is excessive:

> [W]e will initially make a threshold comparison of the gravity of [petitioner's] offenses against the severity of his sentence. Only if we infer that the sentence is grossly disproportionate to the offense will we then ... compare the sentence received to (1) sentences for similar crimes in the same jurisdiction and (2) sentences for the same crime in other jurisdictions.

McGruder v. Puckett, 954 F.2d 313, 316 (5th Cir. 1992). Moreover, when evaluating the excessiveness of a sentence imposed under a habitual offender statute, a court must be mindful that the "sentence is imposed to reflect the seriousness of [petitioner's] most recent offense, not as it stands alone, but in the light of his prior offenses." Id.

The Fifth Circuit has noted that Rummel v. Estelle, 445 U.S. 263 (1980), "establishes a benchmark for disproportionate punishment under the Eighth Amendment." Gonzales, 121 F.3d at 943. In Rummel, the Supreme Court upheld a petitioner's sentence to life imprisonment for obtaining $120.75 under false pretenses. The sentence was imposed under a Texas recidivist statute and took into account petitioner's prior convictions for fraudulent use of a credit card and passing a forged check. The Fifth Circuit observed:

> We acknowledge that the distinction between constitutional sentences and grossly disproportionate punishments is an inherently subjective judgment, defying bright lines and neutral principles of law. Nevertheless, we can say with certainty that the life sentence approved in Rummel falls on the constitutional side of the line, thereby providing a litmus test for claims of disproportionate punishment in violation of the Eighth Amendment.

Gonzales, 121 F.3d at 943 (footnote omitted).

Here, petitioner's sentence fell within the range provided by law. Moreover, his crime, second degree kidnapping, was serious and violent, and his criminal history extensive. In light of those considerations, as well as the finding in <u>Rummel</u> that a life sentence was not excessive for the relatively minor offenses involved in that case, this Court cannot conclude that petitioner's sentence under these circumstances is grossly disproportionate under federal law. Because the sentence is not grossly disproportionate, this Court's "inquiry is finished." <u>Gonzales</u>, 121 F.3d at 942.

## Ineffective Assistance of Counsel

Lastly, petitioner claims that he received ineffective assistance of counsel. In the state post-conviction proceedings, the state district court denied that claim, holding:

> Petitioner Dickerson raises a claim of ineffective assistance of counsel on several grounds. First, petitioner contends he was denied by his counsel the right to testify in his own defense at trial. While petitioner Dickerson stated in his memorandum that he is attempting to obtain an affidavit from his trial counsel in order to support this claim, the Court finds that this claim is without merit, either with or without such an affidavit. If counsel had advised petitioner to testify and petitioner chose to do so, petitioner's prior criminal history would have been revealed to the jury through cross-examination. Petitioner Dickerson has offered no evidence to support this claim of ineffective assistance of counsel and the contention that the outcome of the trial may have been different had petitioner testified. Secondly, petitioner Dickerson argues that his counsel refused to call the witnesses he requested. Again, petitioner indicates in a footnote that he is attempting to obtain an affidavit from one witness. The Court finds that this claim is likewise without merit as petitioner failed to carry his burden of demonstrating that the outcome of the trial would have been different had this particular witness testified. Thirdly, petitioner states that his counsel was ineffective by allowing other crimes evidence to be admitted without objection. The "other crimes evidence" to which petitioner refers is the fact of petitioner's incarceration or the fact of petitioner being out on bond while these incidents took place. The record demonstrates that those very specific facts were interwoven with the facts of the offense for which petitioner was on trial, and counsel were both cautioned by the Court that no reference was to be made to the underlying crime for which defendant Dickerson may have been incarcerated or out on bond. That instruction was in fact

followed by the State and the defense.  The Court finds this claim is without merit and it is denied.[25]

His related writ applications were likewise denied by the Louisiana First Circuit Court of Appeal[26] and the Louisiana Supreme Court without additional reasons assigned.[27]

In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court established a two-prong test for evaluating such claims.  Specifically, a petitioner seeking relief must demonstrate (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced his defense.  Id. at 697.  A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is

---

[25] State Rec., Vol. 5 of 7, Reasons for Judgment dated May 22, 2014.
[26] State v. Dickerson, No. 2014 KW 0922, 2014 WL 12569891 (La. App. 1st Cir. Sept. 8, 2014); State Rec., Vol. 5 of 7.
[27] State ex rel. Dickerson v. State, 178 So.3d 136 (La. 2015); State Rec., Vol. 5 of 7.

necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

As noted, the state court denied petitioner's ineffective assistance of counsel claim on the merits. Because such claims present a mixed question of law and fact, this Court must defer to the state court decision unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). Moreover, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of an ineffective assistance of counsel claim is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two

questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." <u>Ibid</u>. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." <u>Knowles v. Mirzayance</u>, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

<u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (citation omitted). The Supreme Court then explained:

Surmounting <u>Strickland</u>'s high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the <u>Strickland</u> standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

Id. at 105 (citations omitted; emphasis added). Therefore, on a habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt." Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted). For the following reasons, the Court finds that, under those stringently deferential standards, it simply cannot be said that relief is warranted with respect to petitioner's ineffective assistance of counsel claim.

Petitioner first argues that counsel was ineffective for failing to allow petitioner to testify at trial. "[I]t cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." Rock v. Arkansas, 483 U.S. 44, 49 (1987). However, petitioner has offered nothing other than his own self-serving allegations in support of his claim. He does not allege, and the record does not suggest, that he ever made known to the trial court that his counsel was refusing to allow him to testify despite his stated desire to do so. Of course, the mere fact that petitioner failed to stand up in open court and insist on testifying should not be dispositive of the issue. See United States v. Mullins, 315 F.3d 449, 455 (5th Cir. 2002); see also United States v. Araujo, 77 Fed. App'x 276 (5th Cir. 2003). Nevertheless, this Court cannot ignore the fact that petitioner has never presented any evidence to corroborate his allegations. As the United States Seventh Circuit Court of Appeals noted in a case in which a petitioner alleged that he had been denied the right to testify by his counsel:

> There is grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right (that is, a right not waivable by counsel) to testify on his own behalf without rendering the criminal process unworkable. It is extremely common for criminal defendants not to testify, and there are good reasons for this, as we have seen. Yet it is simple enough after being convicted for the defendant to say, "My lawyer wouldn't let me testify. Therefore I'm entitled to a new trial." ...

> ... [A] barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him. It just is too facile a tactic to be allowed to succeed. Some greater particularity is necessary – and also we think some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify – to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim.

Underwood v. Clark, 939 F.2d 473, 475-76 (7th Cir. 1991); accord Richthofen v. Cain, Civ. Action No. 05-5701, 2008 WL 630477, at *44-45 (E.D. La. Mar. 7, 2008); Curtis v. Cain, Civ. Action No. 06-1676, 2008 WL 482849, at *8-9 (E.D. La. Feb. 13, 2008); Baker v. Cain, Civ. Action No. 06-2039, 2007 WL 2174959, at *10-11 (E.D. La. July 26, 2007); White v. Cain, Civ. Action No. 06-1576, 2006 WL 3703240, at *4-5 (E.D. La. Dec. 11, 2006); Turcios v. Dretke, No. Civ. A. H-97-0515, 2005 WL 3263918 (S.D. Tex. Nov. 29, 2005).

To the extent that petitioner may perhaps also be claiming that his counsel was ineffective in failing to call him testify, that contention likewise fails. A decision whether to put a criminal defendant on the stand "is a 'judgment call' which should not easily be condemned with the benefit of hindsight." United States v. Garcia, 762 F.2d 1222, 1226 (5th Cir. 1985); accord United States v. Mullins, 315 F.3d 449, 453 (5th Cir. 2002); Amos v. Cain, Civ. Action No. 04-2029, 2008 WL 782472, at *11 (E.D. La. Mar. 20, 2008); Curtis v. Cain, Civ. Action No. 06-1676, 2008 WL 482849, at *10 (E.D. La. Feb.13, 2008). Further, such a matter is inherently one of trial strategy, and federal habeas courts generally are not to second-guess counsel's decisions on matters of trial tactics; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. Strickland, 466 U.S. at 689.

The instant habeas proceeding is far removed from the context of the actual trial, and this Court has no mechanism available to fairly judge counsel's assessment of his own client at the time and his view of the strength of the prosecution's case as it was presented live. Under these circumstances and in light of the foregoing law regarding the deference that must be accorded to counsel's strategic decisions, the Court declines to second-guess counsel's decision not to put petitioner on the stand, especially in light of his extensive and potentially prejudicial criminal history. This Court simply cannot find that counsel performed deficiently by failing to have petitioner testify at trial.

Petitioner next argues that counsel was ineffective for failing to call Memrie Bynum to testify at trial. In support of his claim, petitioner submitted an affidavit from Bynum concerning her discussion with Davidson Ehle, III, petitioner's defense counsel, regarding the possibility of her testifying at petitioner's trial. She stated:

> I spoke with Davidson E. Ehle III about giving my testimony and was told he would call me if I was needed. Davidson never called me back.
>
> Stephanie Lemme contacted me back in 2008 and told me that she had found my Telephone number in Dennis's cell phone. She then proceeded to ask me questions about mine and Dennis Dickerson's relationship. Stephanie wanted to know if I had still been seeing Dennis during the time they were together. My answer to her question was that I had seen him multiple times. I also told her Dennis has drove a blue motorcycle to Mississippi to see me, and that I had been to her house in Louisiana to see him as well. She then proceeded to ask me did we have sexual intercourse during any of our visits. I responded with a yes. Stephanie then became a little upset and said she could not believe Dennis would do that to her after all she had done for him. That was the end of our conversation. She called back one or two times but I did not answer.[28]

---

[28] Rec. Doc. 4-2, p. 27. This affidavit apparently was not submitted to the trial court with the original post-conviction application; however, it was submitted in connection with petitioner's related Louisiana Supreme Court writ application.

Although petitioner has therefore shown both the content of Bynum's proposed testimony and that she was in fact amenable to testifying at trial, it does not necessarily follow that counsel was ineffective for failing to call her. On the contrary, "complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy...." Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009); accord Bray v. Quarterman, 265 Fed. App'x 296, 298 (5th Cir. 2008); Hinkle v. Dretke, 86 Fed. App'x 687, 688 (5th Cir. 2004). In fact, there is a "strong presumption" that counsel's failure to call a witness was a strategic decision. Murray v. Maggio, 736 F.2d 279, 282 (5th Cir. 1984). As already noted, the United States Supreme Court has cautioned courts not to second-guess counsel's decisions on such matters of strategy through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. Strickland, 466 U.S. at 689. Moreover, it is irrelevant that another attorney might have made other choices or handled such issues differently. As the Supreme Court noted: "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Id.

Here, petitioner has presented no evidence to overcome the dual presumptions that the failure to call Bynum was a strategic and reasonable decision. Further, there are obvious reasons that counsel may have made this choice. In the instant case, the prosecution took great pains to portray the victim as an unattractive, lonely woman who was emotionally, physically, and financially victimized by an inmate who exploited her feelings as a means to get himself out on

bond.[29]  Bynum's proposed testimony would only have enhanced that view – if anything, it evidenced that both she and petitioner treated the victim with callous disregard, thereby making her appear *even more* sympathetic.  Further, by her own admission, Bynum and petitioner had been romantically involved, and so her credibility and motives for testifying on his behalf would necessarily be questioned by the jurors.  See, e.g., Sholes v. Cain, Civ. Action No. 06-1831, 2008 WL 2346151, at *15 (E.D. La. June 6, 2008) (noting that petitioner's girlfriend would be an inherently suspect witness), aff'd, 370 Fed. App'x 531 (5th Cir. 2010).  And perhaps foremost, Bynum's proposed testimony in no way exculpated petitioner – she was not present during the crime and could offer nothing to show that petitioner was not in fact guilty of the second degree kidnapping charge.  In light of these considerations, counsel could well have concluded that

---

[29] That strategy was clear from the outset, with the following summary of the case included in the prosecution's opening statement:

> Stephanie Lemme is an LPN and in many ways, which you'll understand shortly, she ended up being the perfect target.  Stephanie grew up and she was always heavy; she weighed as much as 270 pounds.  Her first marriage resulted in divorce when she discovered that her husband was cheating on her.  She's had a gastric bypass and she's lost some weight, but I suspect inside, always, is the fat kid who was rejected at every turn.
>
> She was working as an LPN in the St. Tammany Parish Jail.  She was befriended by the defendant.  He was being held and he asked her to make contact with his mom.  Over a period of time, he cultivated that feeling on her part.  Spoke with her; there was interactions between Stephanie and his mom that she could transmit back to him.  And she really began to feel like this was somebody that she wanted to spend more time with.
>
> She eventually made a series of tragic errors.  One of them was that she spent a great deal of her own money in posting a bond for the defendant.  She had to sell some of her property.  She was no longer working at the jail so she allowed him to move in with her to her tidy, neat, light little house with her dog.  She allowed him to drive her car.  And for whatever days that this took place, she had a companion.  She had somebody that was with her and that she felt like her future was going to be involved with.
>
> Well, you know, it didn't turn out that way.  Eventually, the defendant's habits – his consumption of alcohol; the way he treated her began to deteriorate.  In July, less than five weeks after she had allowed him to move in with her, he struck her for the first time.

State Rec., Vol. 1 of 7, trial transcript, pp. 168-70.

Bynum would be an unsympathetic witness of dubious credibility who would be of doubtful value to the defense.[30]  Accordingly, this claim has no merit.

Finally, petitioner argues that his counsel was ineffective for agreeing with the state concerning the fact that, due to the circumstances of this case, petitioner's prior arrest, conviction, and incarceration would need to be revealed to the jury.  Defense counsel's quandary regarding this issue was addressed at the commencement of trial:

> THE COURT:
> Counsel, anything before we bring the jury?
>
> MR. EHLE:
> Actually, there is, Your Honor.  Mr. Gardner [the prosecutor] and I discussed this morning the component of this case that Mr. Dickerson was incarcerated at the inception of the facts of this case.  All through the facts of the case, Mr. Dickerson is either out on bond or incarcerated.  I have tried to think of several different ways that I can present this defense without referring to either his bond status or him being incarcerated, and I just can't think of any way I can present my defense without informing the jury that he was incarcerated and he was out on bond.  Quite frankly, I don't see how the State can present its case either, without the jury being informed of that.  So I guess what I'd like to put on the record is that we have tried to figure out a way to keep that from the jury, but because of the facts of the case I just don't see how we can.
>
> THE COURT:

---

[30] Counsel is clearly allowed to make such choices.  As the United States First Circuit Court of Appeals has noted:

> The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony.  The witness may not testify as anticipated or the witness's demeanor or character may impress the jury unfavorably and taint the jury's perceptions of the accused; or the testimony, though sympathetic, may prompt jurors to draw inferences unfavorable to the accused.

Lema v. United States, 987 F.2d 48, 54 (1st Cir. 1993) (citations omitted).  The court continued:

> Reasonably competent trial counsel might well have determined that the best prospect for acquittal lay in discrediting the government's witnesses, rather than presenting additional testimony which could appear to legitimate the government's case or raise questions about the defense not previously suggested by the government's evidence.

Id.

Do I take it then that you have no objection to the mentioning of that status by either yourself, obviously, or the State?

MR. EHLE:
That is correct, Your Honor.

THE COURT:
Anything you need to address on that, Mr. Gardner?

MR. GARDNER:
No. We had envisioned such a situation, and I've crafted a relatively generic opening statement that does reference that fact, but not in any specifics and not in any prejudicial format.

THE COURT:
I would caution the State to make it as generic as possible and not in any way try to utilize it as a tool to paint Mr. Dickerson in a bad light. The facts are what they are and whether he was on bond or incarcerated is simply a factual matter. But no reference to the underlying crimes to which he may have been incarcerated or may have been out on bond, unless there's some special relevance that you'll need to probably approach about, if that situation comes up.[31]

As defense counsel, the prosecutor, and the judge all realized, petitioner's prior incarceration and release on bond was crucial to the jury's ability to understand this case. Petitioner and the victim commenced their relationship while he was incarcerated; he was an inmate, and she worked at the jail. Petitioner then convinced her to put up a bond so he could be released and they could further their relationship. The instant crime occurred while petitioner and the victim were on a trip to Mississippi to resolve criminal charges against him in that state. Part of petitioner's defense is that the victim was a woman scorned who has reacted by falsely accusing him, and he argues that her purported vindictiveness was evidenced by the fact that she had his bond revoked. Under these facts, it is evident that both the state and the defense needed to be able to reveal to the jury the fact of petitioner's prior incarceration and release on bond in order to

---

[31] State Rec., Vol. 1 of 7, trial transcript, pp. 159-61.

present their respective cases. In any event, because the evidence was offered for permissible purposes rather than to establish petitioner's bad character in violation of La. Code Evidence art. 404, there was no basis for the defense to move to exclude the evidence. As a result, even if defense counsel had not agreed for his own strategic reasons, there would have been no merit to a motion to preclude the prosecution from presenting the evidence. It is beyond cavil that counsel cannot be considered ineffective for failing to file a meritless motion. United States v. Gibson, 55 F.3d 173, 179 (5th Cir. 1995) ("Counsel is not required by the Sixth Amendment to file meritless motions."); see also United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."); Sones v. Hargett, 61 F.3d 410, 415 n.5 (5th Cir. 1995) ("Counsel cannot be deficient for failing to press a frivolous point.").

For all of the foregoing reasons, it is clear that petitioner has not demonstrated that the state court's decision rejecting his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such a claim, this Court should likewise deny relief.

## RECOMMENDATION

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Dennis Dickerson be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days

after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[32]

New Orleans, Louisiana, this eleventh day of April, 2017.

DANIEL E. KNOWLES, III
UNITED STATES MAGISTRATE JUDGE

---

[32] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.